UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CHRISTY SENSAT, § § § | |
| Plaintiff, § § | Case No.: 4:21-cv-00000 |
| v. § § | |
| PRIME COMMUNICATIONS, LP and § POLARIS-PC MANAGEMENT, LP, § § | TRIAL BY JURY DEMANDED |
| Defendants. § § | |

**PLAINTIFF'S ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF**

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE: [1]

Christy Sensat, ("Plaintiff"), complains of Prime Communications, LP and Polaris-PC Management, LP ("Defendants") and for cause of action would show the Court as follows:

## INTRODUCTION

1. Plaintiff demands a jury trial in this case as to any and all issues triable to a jury.

2. Plaintiff files this Complaint and complains of sex discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, and disability discrimination and retaliation under the Americans with Disabilities Act of 1991 ("ADA"), as amended.

---

[1] For the Court's information, Plaintiff's counsel who prepared this document, Edwin Villa, is visually impaired and uses assistive technology when drafting documents. In particular, counsel relies on screen reader technology, which reads aloud as the document is being typed. As a result, certain typos and formatting issues are difficult to recognize. Therefore, please forgive any such issues in this document.

1

3. This action seeks compensatory and punitive damages, plus lost wages (past, present, and future), attorney's fees, emotional distress and mental anguish, taxable court costs, pre-judgement and post-judgement interest.

## PARTIES

4. Plaintiff, Christy Sensat, is a resident of Katy, Texas.

5. Defendant, Prime Communications, LP, is a Texas limited partnership authorized to do business in the state of Texas and process may be served by mail or in person on its registered agent, Capitol Corporate Services, Inc., located at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

6. Defendant, Polaris-PC Management, LP, is a Texas limited partnership authorized to do business in the state of Texas and process may be served by mail or in person on its registered agent, Capitol Corporate Services, Inc., located at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

## VENUE

7. Venue is appropriate in the United States District Court for the Southern District of Texas—Houston Division in that Defendants' Sugar Land office in which Plaintiff worked is located in this district and division. Therefore, Defendants can be said to reside or do business in this district and division as required under 28 U.S.C. § 1391.

## JURISDICTION

8. This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) under Title VII of the Civil Rights Act of 1964, as amended, and under the ADA of 1991, as amended.

9. The unlawful employment practices were committed within the jurisdiction of this Court.

## PROCEDURAL REQUISITES

10. All conditions precedent to the filing of this action have been met by Plaintiff in that she has filed a timely complaint with the Equal Employment Opportunity Commission ("EEOC") and has received a right-to-sue letter from said agency to pursue her claims.

11. Plaintiff filed a Charge of Discrimination against Defendants with the EEOC on or about August 17, 2020.

12. Plaintiff then filed an amended Charge of Discrimination against Defendants with the EEOC on or about December 3, 2020.

13. Plaintiff was issued a Notice of Right to Sue letter from the EEOC, entitling her to file suit on her claims of discrimination based on sex, hostile work environment, disability, and retaliation on or about January 19, 2021.

14. The filing of this lawsuit has been accomplished within ninety (90) days of Plaintiff's receipt of notice from the EEOC.

## FACTS

15. Plaintiff is a female.

16. Plaintiff began working for Defendants on January 23, 2017 at Defendants' service center headquarters in Sugar Land, Texas.

17. At the time of Plaintiff's termination, Plaintiff held the position of Lease Administration Manager.

18. Defendants are the largest AT&T authorized retailer in the United States. Defendants own and operate approximately 2,000 retail locations.

19. Throughout Plaintiff's employment for Defendants, Plaintiff has been forced to work in a sexually charged, hostile work environment. This work environment led to Plaintiff being

a #MeToo victim, sexually harassed and discriminated against, leading to Plaintiff having severe issues that resulted in Plaintiff's need for accommodations to allow Plaintiff to work from home while receiving medical treatment for Plaintiff's disability.

20. After Plaintiff complained to Defendants' Human Resources department ("HR") regarding the sexual harassment that she was forced to endure and the hostile work environment, Plaintiff began to be retaliated against by Defendants.

21. Similarly, once Plaintiff was granted the accommodation of working from home, Plaintiff also began to be retaliated against by Defendants.

22. Plaintiff made numerous complaints to Defendants' HR department regarding the sex and disability discrimination, hostile work environment, and retaliation, and was ultimately unlawfully terminated by Defendants in retaliation.

23. Upon Plaintiff's initiation of employment with Defendants, Plaintiff quickly noticed the prevalent culture of male domination at Defendants' workplace. However, it was later blatant acts of sexual discrimination and harassment that led Plaintiff to complain to Defendants' HR department.

24. For example, Plaintiff had an incident occur with a coworker, Trevor Weerasinghe, where Plaintiff's husband was dropping Plaintiff off from having lunch together and Weerasinghe made a comment about Plaintiff and Plaintiff's husband being together sexually by putting his finger into the hole of his other hand that was in a fist, thereby illustrating a penetrating action with his finger into his fist. This was extremely offensive to Plaintiff and a clear violation of Defendants' policy.

25. During a call with HR, Plaintiff was told that this incident and behavior was addressed by Defendants and that Weerasinghe was coached and trained not to act in this manner and has not done so since.

26. Another incident occurred where another employee and member of management, Karim Mussa, made very offensive sexually/racially charged comments. Specifically, while conversing with other coworkers, Mussa used the term "Jungle Bunny" repeatedly, and when Mussa was told that this term was sexually/racially charged and to stop using it, he continued to use the term several more times.

27. Plaintiff was also told by Defendants' HR that this other male employee was coached and trained in regard to his offensive behavior and allowed to remain employed with Defendants.

28. Plaintiff has also personally had several instances of inappropriate discriminatory acts aimed at Plaintiff by a member of management, Aslam Jiwani. For instance, prior to entering into a meeting, Jiwani told Plaintiff to keep Plaintiff's "hoo-hah" shut." This was extremely offensive and inappropriate because the term "hoo-hah" is a derogatory slang term meaning vagina. Basically, Jiwani was telling Plaintiff to shut up during a meeting but did so by telling Plaintiff to keep Plaintiff's vagina shut. This sort of talk at Defendants' workplace was quite common and very offensive to Plaintiff.

29. This was not the first time Jiwani acted in such a sexually discriminatory manner. Defendants actually had a whole team of women quit because of the abuse they received at the hands of the male management team. These women were working for Defendants from Pakistan and would work with Plaintiff remotely. However, after these women quit, Plaintiff was told by Jiwani to hire only men as their replacements.

30. Another incident occurred where Jiwani was speaking to a group of male and female employees prior to a religious holiday that many of Defendants' employees would be partaking in and that would require them to be at home. During this meeting, Jiwani made a comment to the male employees that they were welcome to come into the office if they got "tired of being stuck with all those women" at home. This was another unacceptable discriminatory comment where Jiwani was clearly portraying his negative feelings about women.

31. This sentiment was furthered when Jiwani stated in a Thursday team meeting that he "needed a man to come in and lead the department." Here, Jiwani was referring to the lease administration department, where Plaintiff worked, and was referencing a new hire that he had made where he hired Al Lalani, who had absolutely no experience and had no idea what he was doing.

32. The most traumatic and offensive experience Plaintiff had to endure while employed by Defendants occurred at Defendants' office Christmas party in December of 2019. At this event, Plaintiff was publicly sexually harassed in front of the whole company by Executive Vice President, Naushad Kermally.

33. During this party, Plaintiff was told by Naushad Kermally to come up to the stage and bring Plaintiff's husband because Plaintiff was going to be recognized for some reason. Plaintiff did so, believing that Plaintiff was going to be acknowledged for Plaintiff's great performance for the company. Instead, to Plaintiff's disgust and horror, Plaintiff was brought up on stage and sexually harassed.

34. This sexual harassment came in the form of being publicly humiliated in front of Plaintiff's peers, coworkers, and upper management of the company. Plaintiff was completely caught

off-guard and virtually forced to partake in what was called "The Newlywed Game." During this "game," Plaintiff was asked numerous inappropriate and disgusting personal questions about Plaintiff's sex life with Plaintiff's husband.

35. For example, a few of the questions asked to Plaintiff by Naushad Kermally were, "Where's the craziest place you ever had sex?", "Which friend of your spouse would you most like to see in a bikini?", "If your spouse were a sex animal what kind of sex animal would they be?", "What is your favorite body part of your spouse and why?"

36. This was all done on stage and in front of the whole company. The other "contestants" were both male and were high ranking executives. Plaintiff was intimidated and put into a situation where Plaintiff was the only female, non-executive employee on stage with numerous members of Defendants' executive management team.

37. The fact that the "game" itself was being conducted by an Executive Vice President of the company intimidated and forced Plaintiff to participate.

38. The questions Plaintiff was asked were completely inappropriate and offensive and Plaintiff has found it almost impossible to be respected and treated seriously in the company. Plaintiff was taken advantage of by Defendants and has experienced a great deal of emotional distress as a result.

39. Plaintiff has been confronted by coworkers and management since this incident where they asked Plaintiff offensive questions based on this incident (the "Newlywed Game").

40. Due to the sexual harassment Plaintiff endured from Defendants and the hostile work environment previously discussed, Plaintiff brought her complaints to Defendants' HR department. The first time Plaintiff contacted HR was on June 15, 2020. Plaintiff spoke to

Gabby Moses, who is in-house counsel and the head of HR. Moses deferred to Meagan Conway, who is also in-house HR counsel.

41. Plaintiff started talking to Conway via email on June 16th. Plaintiff then had an audio call with Conway and April Paxton on July 7th, and then another one on July 10th. Plaintiff expressed her concerns about the aforementioned incidents and about the harm that these incidents have caused Plaintiff.

42. Plaintiff then took a two-week leave, using Plaintiff's vacation time, in order to attempt to deal with the emotional stress and anguish that Plaintiff suffered as a result of these incidents.

43. While being medically treated for symptoms caused by the sexual harassment and hostile work environment that Plaintiff suffered while employed by Defendants, Plaintiff was put on doctor's orders to work from home.

44. Unfortunately, instead of addressing Plaintiff's concerns, Plaintiff was retaliated against and ultimately wrongfully terminated by Defendants.

45. This retaliation came in the form of isolation and ostracizing by Plaintiff's coworkers and management. For example, prior to Plaintiff's complaints to HR and leave of absence, Plaintiff almost had more work than she could handle, and Plaintiff worked side-by-side with Plaintiff's supervisor, Sarai Cebollero. When Plaintiff took those two weeks off, per Plaintiff's doctor's orders, Defendants brought in Pam Buchman, who is the director of construction, and has experience in Lease Administration, to fill in while Plaintiff was gone.

46. However, once Plaintiff returned and was working from home, as directed by Plaintiff's doctor, the work Plaintiff received was almost exclusively from Plaintiff's team in Lahore,

Pakistan, and not from Plaintiff's supervisor. Instead, Cebollero gave Plaintiff's workload, with the exception of the work Plaintiff's Lahore team does, to Buchman. Cebollero very seldomly asked Plaintiff to do anything, and for the most part, Plaintiff was isolated by Defendants and cut out of any of the responsibilities Plaintiff previously had at Defendants' home office.

47. Defendants had team meetings every day at 9am, and during those meetings, Plaintiff asked when Buchman would go back to her normal duties, and Plaintiff never got a direct answer. The company was trying to phase Plaintiff out and was doing so in retaliation for Plaintiff's complaints of hostile work environment, sexual harassment, and because Plaintiff was working from home due to Defendants' actions.

48. Further, during those meetings, Cebollero constantly complained about having too much to do, so Plaintiff said a number of times, "Please send over whatever you need help with, and I'll do it." However, Cebollero never even acknowledged that Plaintiff asked for the work and never provided any of this work to Plaintiff.

49. At this point, Cebollero was sending Plaintiff one to three emails a day and did not share the workload. This was a dramatic shift because Cebollero would normally send Plaintiff dozens of emails every day.

50. There was no reason for this change in behavior, and the only thing that changed was that Plaintiff had made a #MeToo sex harassment/discrimination complaint to HR and was ordered to take time off and then work from home, per Plaintiff's doctor's orders.

51. Defendants' disability discrimination and retaliation was clearly demonstrated during one of the daily meetings where Plaintiff asked Cebollero when she was going to get her normal workload back, and Cebollero stated that Plaintiff would get her workload back when

Plaintiff returned to work at the office. This was an example of Plaintiff's supervisor not following Plaintiff's doctor's orders and failing to accommodate Plaintiff by refusing to give Plaintiff her normal workload back until Plaintiff returned to work at the office, even though Plaintiff was working from home based upon Plaintiff's doctor's orders.

52. Plaintiff again brought all of these issues to Defendants' HR, but instead of conducting an investigation into Plaintiff's complaints and request for accommodations, Defendants began conducting an investigation into Plaintiff.

53. Defendants falsely accused Plaintiff of performance issues, even though Plaintiff was recently honored as one of their top performers and never once had any documented issues regarding job performance, and was also just given a bonus in July for Plaintiff's job performance for the first half of the year.

54. Defendants completely failed to take Plaintiff's claims seriously and instead terminated Plaintiff on October 13, 2020 based on completely false allegations of poor job performance.

55. Plaintiff was never previously coached or trained for any alleged performance issues, never previously written up for any alleged performance issues, and was never placed on any sort of performance improvement plan or given a final warning regarding any alleged performance issues, but instead was immediately terminated based on fabricated and unfounded performance issues.

56. Again, Plaintiff was never afforded any opportunity to address and correct any alleged performance issues, unlike Defendants' male employees who were afforded such opportunities for documented issues of sex harassment, race discrimination, and sex discrimination.

57. Although Plaintiff was a high performer for Defendants since Plaintiff started working for the company, Plaintiff was forced to endure numerous acts of #MeToo sexual discrimination, was sexually harassed and humiliated in front of Plaintiff's coworkers by Defendants, was discriminated and retaliated against because of Plaintiff's disability issues, and was ultimately terminated in retaliation for complaining about these wrongs.

## COUNT I

### DISCRIMINATION BASED ON SEX UNDER TITLE VII

58. Plaintiff re-alleges and incorporates into count one, paragraphs 1-57.

59. Defendants, by and through their agents and employees, intentionally engaged in the aforementioned practices, policies, customs, and usages made unlawful by Title VII, as amended, and directly discriminated against Plaintiff because of her sex, by harassing her and firing her due to her sex, while at the same time failing to terminate male employees who egregiously violated company policy.

60. Defendants, by and through their agents, have maintained a policy of sex discrimination in violation of the foregoing statute against Plaintiff.

61. If Plaintiff was not female, she would not have been harassed, treated poorly, and unlawfully discharged.

## COUNT II

### HOSTILE WORK ENVIRONMENT HARASSMENT UNDER TITLE VII

62. Plaintiff re-alleges and incorporates into count two, paragraphs 1-61.

63. Defendants, by and through their agents and employees, intentionally engaged in the aforementioned practices, policies, customs, and usages made unlawful by Title VII, as amended, and directly failed to protect Plaintiff from a hostile work environment.

64. Defendants, by and through their agents, have maintained a hostile work environment in violation of the foregoing statute against Plaintiff.

65. Defendants failed to protect Plaintiff from a hostile work environment by failing to take prompt remedial action to protect Plaintiff from the sexual harassment of Naushad Kermally.

### COUNT III

### TITLE VII RETALIATION

66. Plaintiff re-alleges and incorporates into count three, paragraphs 1-65.

67. Plaintiff engaged in a protected activity when she complained about what she reasonably believed to be unlawful discrimination to Defendants' HR department.

68. Defendants were put on notice that Plaintiff was complaining of what she reasonably believed to be unlawful employment practices under Title VII.

69. Defendants, by and through their agents and employees, intentionally engaged in the aforementioned practices, policies, customs, and usages made unlawful by Title VII, as amended, because of their retaliation for complaints of discrimination.

70. Defendants, acting by and through their employees, maintained a policy of retaliation, in violation of the foregoing statutes against Plaintiff.

71. If Plaintiff had not engaged in a protected activity, she would not have been terminated.

### COUNT IV

### DISCRIMINATION BASED ON DISABILITY UNDER THE ADA

72. Plaintiff re-alleges and incorporates into count four, paragraphs 1-71.

73. Defendants, by and through their agents and employees, intentionally engaged in the aforementioned practices, policies, customs, and usages made unlawful by the ADA, as

amended, and directly discriminated against Plaintiff because of her disability, by harassing her and firing her due to her disability.

74. Defendants, by and through their agents, have maintained a policy of disability discrimination in violation of the foregoing statute against Plaintiff.

75. If Plaintiff did not have a disability requiring specific accommodations, she would not have been harassed, treated poorly, and unlawfully discharged.

## COUNT V

### ADA RETALIATION

76. Plaintiff re-alleges and incorporates into count five, paragraphs 1-76.

77. Plaintiff engaged in a protected activity when she complained about what she reasonably believed to be unlawful discrimination to Defendants' HR department.

78. Defendants were put on notice that Plaintiff was complaining of what she reasonably believed to be unlawful employment practices under the ADA.

79. Defendants, by and through their agents and employees, intentionally engaged in the aforementioned practices, policies, customs, and usages made unlawful by the ADA, as amended, because of their retaliation for complaints of discrimination.

80. Defendants, acting by and through their employees, maintained a policy of retaliation, in violation of the foregoing statutes against Plaintiff.

81. If Plaintiff had not engaged in a protected activity, she would not have been terminated.

### DAMAGES

82. As a direct and proximate result of the aforementioned acts, Plaintiff has suffered loss of wages, both in the past, present, and future, as well as compensatory damages, including but not limited to emotional distress.

## EXEMPLARY DAMAGES

83. Defendants' actions were intentional, willful, harsh, oppressive, reckless, and malicious, and as a further and proximate cause, Plaintiff has suffered severe emotional distress, pain, and suffering. The wrongs done by Defendants were aggravated by their willfulness, wantonness, and maliciousness for which the law allows the imposition of exemplary damages. Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the trier of fact to serve as punishment to deter Defendants from such conduct in similar situations.

## ATTORNEY'S FEES

84. Defendants' actions and conduct as described herein and the resulting damage and loss to Plaintiff has necessitated Plaintiff retaining the services of COANE AND ASSOCIATES, PLLC in order to initiate and litigate this proceeding. Plaintiff seeks recovery of reasonable and necessary attorney's fees.

## JURY DEMAND

85. Plaintiff hereby makes her request for a jury trial.

## INJUNCTIVE RELIEF

86. Plaintiff seeks injunctive relief requiring Defendants to take affirmative and effective steps to remove and otherwise discipline managers who have failed to comply with Title VII and the ADA and who violate Federal statutory protection against discrimination.

87. Plaintiff seeks injunctive relief requiring Defendants to take specific actions designed, implemented, and confirmed by qualified non-government consultants to ensure that all supervisory employees are adequately trained to identify, investigate, and stop situations and complaints. Such specific actions include, but are not limited to:

    a. allocation of significant funding and trained staff to implement all changes within two years;
    b. discipline managers who have violated the company's policies and failed to meet their legal responsibility to promptly investigate complaints and to take effective action to stop and deter prohibited personnel practices against employees;
    c. establishing and strictly measuring EEO compliance as a critical element in every manager's performance standards;
    d. creating a process for the prompt investigation of harassment and reprisal complaints separate from the agency's process;
    e. mandatory and effective training for all employees and managers on discrimination and retaliation issues, investigations, and appropriate corrective actions;
    f. eliminating the backlog of current EEO cases alleging discrimination, harassment, and reprisal; and
    g. reinstatement of Plaintiff.

**PRAYER**

88. WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays Defendants be cited to appear and answer, and that on final hearing of this cause, Plaintiff has the following relief:

    a. Back Pay;
    b. Pre-Judgment Interest on Back Pay;
    c. Front Pay;
    d. Compensatory Damages, including but not limited to emotional distress;
    e. Punitive Damages;
    f. Injunctive and Affirmative Relief;
    g. Attorney's Fees and Costs;
    h. Reinstatement; and
    i. Such other and further relief, at law or in equity, general or special, to which Plaintiff may show she is justly entitled;

Dated: April 13, 2021                                    Respectfully submitted,

                                                         COANE AND ASSOCIATES, PLLC

        */s/Bruce Coane*
Bruce A. Coane, Attorney-in-Charge
S.D. Tex. #7205
TX Bar #04423600
Email: bruce.coane@gmail.com
Edwin E. Villa
S.D. Tex. #3339324
TX Bar #24110485
Email: edwin.villa@coane.com
Coane and Associates, PLLC
5177 Richmond Ave., Suite 770
Houston, TX 77056
Telephone: 713-850-0066
Facsimile: 713-850-8528

*ATTORNEYS FOR PLAINTIFF*